Filed 7/26/22 P. v. Sanders CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047615 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1223763) |
| v. | |
| RICKY RENE SANDERS, | |
| Defendant and Appellant. | |

A jury convicted defendant Ricky Rene Sanders of robbing a retail store in San Jose while armed with a firearm. He was sentenced to an indeterminate term of 25 years to life, consecutive to a determinate term of 15 years, and ordered to pay various fines, fees, and assessments.

On appeal, Sanders argues the trial court erred by not permitting defense counsel to impeach a witness with a prior inconsistent statement and by denying his motion for a new trial based on newly discovered evidence. Sanders further argues the cumulative nature of these errors mandates reversal. In addition, Sanders claims there was not substantial evidence supporting the trial court's finding that he could pay the various fines, fees, and assessments imposed and the court failed to hold a contested hearing on his ability to pay.

We reject Sanders's substantive arguments, but determine that he is entitled to the vacatur of any unpaid portion of the criminal justice administration fee. We will modify the judgment accordingly and, as modified, affirm.

# I.   FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural History

On September 24, 2015, the Santa Clara County District Attorney filed an information charging Sanders with five counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (b)).[1]  As to each count, the information alleged that Sanders personally used a handgun in committing the offense (§ 12022.53, subd. (b)).  Finally, the information alleged that Sanders had two prior strike convictions, three prior serious felony convictions, and one prior prison conviction (§§ 667, subds. (b)-(i), 1170.12, 667.5, subd. (b)).

Following a trial, the jury acquitted Sanders on four of the five robbery counts (counts 1-4), but found him guilty on the fifth (count 5).  (§§ 211, 212.5, subd. (b).)  The jury also found true that Sanders personally used a firearm in committing count 5, and in a bifurcated proceeding, found true all of the allegations relating to Sanders's prior convictions.

At sentencing, after denying Sanders's *Romero*[2] motion and motion for new trial, the trial court sentenced him to an indeterminate term of 25 years to life on count 5, a consecutive 10-year term for the firearm enhancement (§ 12022.53, subd. (b)), and a consecutive five-year term for one of his prior serious felony convictions[3] (§ 667, subd. (a)).

As to fines, fees, and assessments, the trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)) and a $10,000 parole revocation fine (§ 1202.45), stayed pending completion of parole.  The court also imposed a $10 crime prevention fund fine plus $31 in penalty assessments (§ 1202.5), a $40 court security fee (§ 1465.8,

---

[1] Unspecified statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[3] The court struck the remaining two prior serious felony convictions (§ 667, subd. (a)) and prior prison term conviction (former § 667.5, subd. (b)) in the interest of justice under section 1385, subdivision (c)(1).

subd. (a)(1)), a $259.50 criminal justice administration fee (former Gov. Code, §§ 29550, 29550.1, 29550.2), and a $30 criminal conviction assessment (Gov. Code, § 70373).

## B. Facts

### 1. Prosecution case[4]

#### a. Robbery

On October 30, 2011, Daniel Kim was working at a Petco store in San Jose. Shortly before closing time, Kim walked around the store to see if any remaining customers needed assistance. Kim saw Sanders in an aisle with dog beds on the shelves, and asked if he needed any help. Sanders, who was wearing a dark hat and a dark coat, said he did not.

Approximately five minutes later, Kim returned to the aisle and saw Sanders was still near the dog beds, so he again asked if Sanders needed help. This time Sanders said he did and asked about " 'memory foam or Tempur-Pedic' " dog beds. Kim informed Sanders that there were beds like that on the shelf in front of him. During his direct examination, Kim said he believed Sanders touched one of the beds. On cross-examination and redirect examination, however, Kim said he could not remember whether Sanders touched any merchandise. Kim also admitted that, in his testimony at the preliminary hearing, he said that Sanders did not touch any merchandise when he spoke to him the second time.

Sanders told Kim he had a gun, which he pulled out and pointed at Kim. Kim described the weapon as a large chrome revolver. Sanders cocked the gun and told Kim he was going to rob the store. He grabbed Kim by the shirt and directed him to turn around. Kim turned and got down on his knees with his hands up. When he looked back at Sanders a few times, Sanders told Kim to stop looking at him.

---

[4] We limit our recitation of facts to those pertaining to the one count of second degree robbery on which Sanders was convicted (count 5).

3

Kim got back to his feet and he could feel Sanders pressing something, which Kim assumed was the gun, into his back. Sanders directed Kim to the back of the store and told him to act as if he were helping other customers. Once they reached the rear of the store, Sanders asked Kim where the safe was located and whether a nearby door had a camera on it. Kim told him the door had a peephole, but no camera.

Sanders told Kim to call the store manager over, and Kim did so, waving for Jaime Jacobo to approach. When Jacobo walked up, Kim told her they were being robbed. Sanders gave Jacobo a bag and led her, along with Kim and a third employee to the front of the store. Jacobo took money from the cash registers and put it in the bag.

Sanders said he also wanted the money from the safe. Jacobo took the money from the safe and put it in the bag as well. She gave the bag to Sanders, who asked for the surveillance video. Jacobo handed him a CD.

Sanders then told everyone to go into the bathroom, but Jacobo said they would not. She told him he could use a security door nearby to leave the store, and Kim opened the door to let Sanders out. Once Sanders left, Kim called the police.

### b. *Police investigation*

San Jose Police Officer Andrew Watson arrived at the store within a few minutes, and interviewed Kim, who was visibly shaken. Kim described the robber as a Black male in his mid-30s, approximately five foot 10 inches tall and 210 pounds, with a silver earring in his left ear. Kim said the robber was wearing a zippered gray sweatshirt, blue jeans, and black shoes "similar to Converse." Kim estimated the robbery occurred between 6:45 p.m. and 7:08 p.m.

Kim told Watson that the robber held a chrome-colored revolver to his back and demanded money. Kim said he did not see the robber touch anything in the store.

Watson also interviewed Jacobo, and she said that the robber got Kim to "lure her to the back of the store." When she got there, the robber threw a bag at her and told her

4

to collect all the money from the safe and the registers. Jacobo was afraid that the robber would use his weapon.

San Jose Police Officer Thanh Tong arrived at the store a few minutes after Watson. Although it was not his responsibility to interview Kim, he talked to him and Kim said the robber touched a dog mat when he was posing as a customer. Tong was able to lift fingerprints from that dog mat which he used to create two fingerprint cards. Tong also collected Kim's shirt for possible DNA evidence, after either another officer or Kim told Tong that the robber had grabbed his shirt.

Video surveillance from the store showed that the robber touched a "dog rug or something like that" in the store before he encountered Kim. When Kim viewed the surveillance video, he said it showed the robber casing the store earlier on the day of the robbery.[5]

Henry Templeman, a latent fingerprint examiner for the San Jose Police Department, testified as an expert witness in "[f]ingerprint analysis comparison." According to Templeman, fingerprints are created when bodily fluids, such as the oil or sweat on a person's skin, are transferred to a surface. The more detail of a print that is transferred, the greater the value of that print as an investigatory tool. In this case, Templeman compared the fingerprints retrieved from the dog mat with images of Sanders's fingerprints retrieved from a statewide database known as the Automated Fingerprint Identification System or AFIS. Any time a person is arrested, images of their fingerprints are electronically generated and uploaded to AFIS. Upon request, AFIS will analyze an exemplar fingerprint and generate a list of "best fingerprint look-alikes" for closer examination.

---

[5] Kim testified that he viewed this surveillance video on a "different day" than the day the robbery occurred, but there was no evidence as to how many days elapsed between the robbery and Kim's viewing of the video.

5

According to Templeman, Tong retrieved two prints—one of the left thumb and the other from the left index finger—from the dog mat. Comparing those prints with Sanders's prints from AFIS, Templeman was certain that the two sets matched. One of the prints lifted from the dog mat had at least 19 similarities with Sanders's exemplar from AFIS, while the other print had at least 15 such similarities.

According to Templeman, because it is not a proven scientific fact that no two people possess identical fingerprints, fingerprint identification is "not a perfectly 100 percent reliable method of identifying an individual human being." The quality of fingerprints can vary substantially and there are no standardized quality thresholds in place to ensure that only fingerprints of a certain minimum quality are used for comparison and identification. Because the threshold for making an identification is subjective, there are concerns about whether one examiner can repeat an identification made by a different examiner. Analysts can confuse the prints of one person for those of another, and sometimes even two impressions of the same finger can be misidentified as prints from two different people. Because fingerprint analysis has sometimes resulted in misidentification, forensic scientists have established new procedures, such as blind verification where a second examiner who knows nothing about the first examiner's results conducts their own analysis.

However, in this case, Templeman testified that the quality of the fingerprint samples he reviewed was excellent, and the agreement between those samples was satisfactory.[6]

Dawn Michel, a latent fingerprint examiner employed by the San Jose Police Department, compared the fingerprint exemplars taken from the dog mat with exemplars of Sanders's fingerprints taken in 1997 and 2002. Michel found more than 20 similarities between the left thumbprint and the left index finger samples.

---

[6] Templeman further testified that two other fingerprint examiners reviewed his work and signed off on the results.

Based on Templeman's conclusions, Detective Brian Meeker generated a photographic lineup which included Sanders's picture. When Kim viewed this lineup, he identified Sanders as the robber. In court, Kim also identified Sanders as the robber, and also identified him as the person depicted in the store's surveillance video.

### c. Prior bad acts[7]

Romilene Encarnacion testified that she was working at the counter of a retail store in Daly City on February 21, 2011. Near closing time, a dark-skinned man entered the store and directed her to open the cash register. The man wore a mask covering the bottom of his face. When Encarnacion indicated she did not have the code to unlock the register, the man pulled out a silver revolver. Encarnacion called for her manager. The manager led the man to the back of the store and opened the safe. The man put the money into a bag and left the store.

Angelica Cervantes testified that she was working as a cashier at a retail store in Menlo Park on May 1, 2011. The store closed at 7:00 p.m. and at about 6:45 p.m., an African-American man wearing a ski mask entered the store carrying a silver revolver. The man walked with Cervantes to the office and the manager gave the man the money from the safe. Cervantes was on her knees in the office, while the man pointed the gun at her head. He told Cervantes and the manager that if the police showed up, he would kill them both. Once the safe was emptied, the man took the manager to the store's registers and emptied them as well before leaving.

Nicholas Ruperto testified that, on April 10, 2011, he was working as a manager of a retail store in Colma. Near closing time, Ruperto was asked via the public address system to report to the cigar booth near the front of the store, which was also close to

---

[7] The following testimony regarding certain robberies committed by Sanders in San Mateo County was admitted under Evidence Code section 1101, subdivision (b) to show that, based on their similarity, Sanders was the individual who committed the charged offenses. The jury also received evidence that Sanders was convicted of the San Mateo County robberies.

7

where the store's safe was located. When he got there, he saw another employee crouched down in the area. A dark-skinned man, wearing a mask and a hoodie and armed with a silver revolver, dragged Ruperto into the booth. The man told Ruperto to open the safe and give him the cash inside, and Ruperto complied.

## 2. Defense case

### a. Forensic science

Forensic scientist Krina Patel testified that a piece of evidence can be analyzed for contact DNA from skin cells that were left behind when someone touched or handled that evidence. Assuming a sufficient amount of DNA can be recovered, forensic scientists can create a DNA profile of that person. Whether or not sufficient DNA could be collected from a particular sample depends on a variety of factors, such as the material touched, whether the person who touched it was a "shedder,"[8] and the degree of contact, e.g., whether the material was grabbed or lightly touched. Patel testified that, with respect to clothing, more skin cells are likely to transfer to fabric with a rougher texture as opposed to fabric with a smoother texture. Also, a person who has recently washed their hands would have fewer free skin cells that could be transferred by touch. As a result, whether forensic scientists are able to generate a DNA profile from an object touched by a suspect was more difficult than generating a profile from bodily fluids, such as saliva, blood, or semen. Patel stated "[i]t depends on the situation and the scenario. Sometimes we get lucky."

### b. Eyewitness identification

Dr. Kathy Pezdek, a cognitive scientist and professor, testified as an expert in the psychological factors affecting accuracy in eyewitness identification. Dr. Pezdek described in detail how memory operates in a three-stage process, consisting of: (1) perception; (2) storage; and (3) identification. She explained there are several factors

---

[8] According to Patel, a "shedder" is someone who "tend[s] to potentially cast off a lot of their skin cells very easily."

8

which can impact the accuracy of a person's identification of another, such as: (1) time of exposure to the other person's face; (2) weapon focus, which is the natural tendency of crime victims to focus on a weapon held by a perpetrator rather than the perpetrator's face; (3) the witness's stress level at the time of the incident which is heightened in cases where a weapon is displayed; (4) the use of disguise by the perpetrator to obscure some or all of their face; and (5) the cross-race effect which is that people more accurately identify individuals who share their race or ethnicity than individuals of other races or ethnicities.

Dr. Pezdek testified that the amount of time between the witness's observation and a subsequent identification can impact accuracy. Shorter delays correlate with more reliable identifications and longer delays with less reliable identifications.

Dr. Pezdek explained that, in reviewing photo lineups, witnesses would sometimes select a photo from such lineups not because they recognize that person, but because they have engaged in a process of elimination. Consequently, when "a witness makes a relatively fast identification, the research shows that that's usually because they did not use a process of elimination and were pretty quick and identified the right person." When a witness takes longer to select a photo, however, that indicates that they are eliminating other photos first, and that process "is less likely . . . to result in a correct identification from a real memory."

Dr. Pezdek opined that police can improve the reliability of photo lineups by requiring that the officer who presents the lineup to the eyewitness have no prior knowledge of which photo is of the suspect. Any officer with such knowledge should not be present because it is possible that officer could, deliberately or inadvertently, provide non-verbal cues to indicate which photo the witness should pick. Other than the standard admonition, the presenting officer should not provide any commentary or feedback during the selection in order to avoid influencing the witness's selection process.

9

With respect to in-court identifications, Dr. Pezdek testified that, due to inherent biases, such identifications are not reliable. For example, at trial, there is typically only one person in the courtroom—the person sitting at the defense table—who could conceivably be the perpetrator. Furthermore, by the time a case comes to trial, a witness will often have seen the defendant multiple times, e.g., at a preliminary hearing, photo lineups, and the like. Given the witness's familiarity with the defendant, the in-court identification can be based more on this familiarity rather than a memory of the defendant from the event itself.

When presented with a hypothetical tracking the evidence in this case, Dr. Pezdek opined that where a witness had two opportunities to view a suspect, the reliability of identification would tend to increase. If the suspect did not display a weapon until "well into the incident," weapon focus would have less of an impact on the reliability of the witness's memory.

Dr. Pezdek further testified that if a witness viewed surveillance video three days after the robbery and mistakenly identified someone in that video as the robber, the reliability of that witness's memory would be diminished, especially as to any subsequent identification of that person. Having made an initial erroneous identification, the witness's memory would tend to substitute that person in place of the actual robber. Also, where an eyewitness erroneously identified the robber in surveillance footage, and in a subsequent photo lineup identified a different person as the perpetrator, the witness had most likely used the photo lineup to test his or her "memory for the person who they thought was the perpetrator, who was in the still shot. [¶] The—the memory is contaminated, in other words."

Dr. Pezdek was then asked to assume additional facts relating to the witness's identification. Specifically, Dr. Pezdek was to assume that the witness: (1) came into court for the preliminary hearing four years after the crime and identified the defendant; (2) subsequently learned the defendant had been convicted of other robberies;

10

and (3) at the trial (an additional two-and-a-half years after the robbery) identified the defendant with "[one] hundred percent" certainty. When asked about the reliability of that witness's testimony, Dr. Pezdek opined that the identifications were "extremely unlikely" to have come from a preserved accurate memory. She explained that "memories just don't persist that long, particularly for faces that we see one time very briefly. The witness's certitude "simply reflects that they've had their memory confirmed so many times" not that their memory remains sharp after six-and-a-half years.

The parties stipulated that, before Kim testified at trial, he knew about Sanders's multiple prior robbery convictions.

## II.    DISCUSSION

### A. Restriction on defense's cross-examination of Kim

Sanders argues the trial court erred when it precluded defense counsel from eliciting evidence of a prior inconsistent statement by Kim regarding the certainty of his identification of Sanders as the robber. Sanders further contends this error violated his Sixth Amendment right to confrontation.

The Attorney General concedes that the trial court erred under state law in not allowing the evidence to come in, but argues that Sanders was not prejudiced by the error. As to Sanders's federal constitutional claims, the Attorney General argues Sanders forfeited those claims by not objecting on those grounds below and, assuming they are not forfeited, the error does not rise to the level of a federal constitutional violation.

We agree that the trial court erred by not permitting defense counsel to cross-examine Kim with his prior statement, but disagree with the Attorney General that Sanders forfeited his constitutional objection. Although this error violated Sanders's Sixth Amendment right to confrontation, we conclude that error was harmless.

### 1. Additional background

On direct examination, Kim testified he was "a hundred percent sure" that Sanders "robbed the Petco."

11

Outside the presence of the jury, defense counsel informed the court that, after Sanders's preliminary hearing, Kim made the following post on his Facebook page: "This is supposedly the guy who robbed our store four years ago, and they're still trying to prosecute him. I had to wait around the courthouse for nine hours to testify as a witness. What a day! #thelegalsystemisajoke. #exceptI'mnotlaughing." The post contained a link to a newspaper article about the robberies, which included a photo of Sanders's face with his name directly underneath.

Defense counsel explained that she planned to cross-examine Kim about the certainty of his identification of Sanders as follows: "Question: Are you certain today that my client is the robber? [¶] And I expect he'll answer 'Yes.' [¶] Next question: After you testified at the preliminary hearing in this case, you weren't certain that my client was the robber. [¶] . . . [¶] If he says, 'Yes,' he agrees that after he testified at the preliminary hearing, he was not certain my client was the robber, I'm finished with the line of questioning. [¶] If he says, 'No,' that after he testified at the preliminary hearing— right?—and essentially says that he was certain my client was the robber, then I would like to use his Facebook post to impeach him. And the impeachment is the following: [¶] Question: You posted to Facebook after testifying at the preliminary hearing on September 14, 2015, quote, 'This is supposedly the guy who robbed our store four years ago,' end quote. [¶] So it—you can see why I'm previewing this to the Court. It may raise the idea of his post to Facebook if it becomes a valid impeachment as a prior inconsistent statement about his certainty level. So I am asking the Court's permission of whether I may or may not pursue that line of questioning when [Kim] returns [to the witness stand]."

The trial court denied defense counsel's request, explaining that "in the context there it's a prosecution going forward. It's not a comment on his certainty in his identification[, and] . . . the relevance of that line of questioning is minimal."

## 2. *Applicable law and standard of review*

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 723.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*), disapproved on another ground by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

" ' "Hearsay evidence," ' defined as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated,' is generally inadmissible. (Evid. Code, § 1200.)" (*Guerra, supra*, 37 Cal.4th at p. 1113.) However, where a witness's in-court testimony is inconsistent with the witness's prior out-of-court statement, the prior out-of-court statement may be admitted for its truth if certain conditions are met. (Evid. Code, §§ 1235, 770.) In general, if a witness is given an opportunity to explain or deny the prior inconsistent statement and the witness has not yet been excused, the prior inconsistent statement may be admitted. (Evid. Code, § 770, subds. (a) & (b).)

" 'The "fundamental requirement" of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony.' [Citation.] ' "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . ." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) As a result, an allegedly inconsistent statement should not be excluded on relevance grounds simply because the witness may be able to reconcile it or explain the inconsistency. The jury should be allowed to hear both the statement and any explanation offered by the witness and gauge how much effect, if any, it has on the witness's credibility.

We agree with Sanders and the Attorney General that the trial court erred in excluding the evidence of Kim's Facebook post, thus precluding defense counsel from

13

questioning Kim on that subject. Kim's use of the word "supposedly" in that post was arguably in direct contradiction to his trial testimony that he was certain Sanders was the robber. While this error violated Sanders's constitutional confrontation rights, we conclude the error was harmless.

### 3. Forfeiture

The Attorney General claims that Sanders has forfeited his claim of Sixth Amendment error by failing to raise that specific objection below, citing *People v. Redd* (2010) 48 Cal.4th 691, 730. However, as the Attorney General acknowledges, forfeiture will not be found where the constitutional claim " 'do[es] not invoke facts or legal standards different from those [the defendant asked] the trial court . . . to apply.' " (*Id*. at p. 730, fn. 19.)

In the trial court, Sanders sought to introduce this hearsay evidence in order to confront Kim with an arguably inconsistent statement regarding the certainty of his identification, thereby impeaching Kim's credibility. So long as "the trial objection fairly informs the court of the analysis it is asked to undertake," the objecting party need not "inform the court that it believes error in overruling the actual objection would violate" his constitutional rights. (*People v. Partida* (2005) 37 Cal.4th 428, 437.) We are confronted with the same facts and legal standards as the trial court, and therefore, we conclude there was no forfeiture.

### 4. Prejudice

Both the federal and the state Constitutions guarantee criminal defendants the right to be confronted with the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 2.) "[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [declarant's] statement.' " (*Dutton v. Evans* (1970) 400 U.S. 74, 89.) "Any denial or significant diminution of this right deprives the accused of an essential means to test the credibility

14

of his accusers and thus 'calls into question the ultimate " 'integrity of the fact-finding process.' " ' " (*People v. Louis* (1986) 42 Cal.3d 969, 983.)

We cannot say that defense counsel's inability to question Kim about his Facebook post, linking to an article about the robbery which included a photo of Sanders, and writing that " '[t]his is *supposedly* the guy who robbed our store four years ago' " (italics added), did not violate Sanders's rights under the Confrontation Clause of the Sixth Amendment. The post suggests that Kim was uncertain that Sanders was the robber and, based on this evidence, the jury may well have determined that Kim's other identifications of Sanders were not as reliable.

As we have found constitutional error, our standard of review is clear and requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.) Reversal is required if there is a " 'reasonable possibility that the evidence complained of might have contributed to the conviction.' " (*Id.* at p. 23.)

Given the fingerprint evidence linking Sanders to this robbery, it is clear beyond a reasonable doubt that, even absent the error, the jury would have convicted Sanders.

The jury was informed that Kim told an investigating officer that, while he was still pretending to be a customer, the robber touched a dog mat at the store. An officer testified that the surveillance video from the store showed the robber touching a "dog rug or something like that" in the store before he made contact with Kim. Subsequently, Tong was able to lift two fingerprints from that dog mat. Two fingerprint examiners, Templemen and Michel, testified that those fingerprints matched Sanders's.

Although Sanders is correct that "the case centered on the perpetrator's identity," his focus on the certainty of Kim's identification as a factor in the conviction is misplaced. The fact that the jurors requested a readback of the testimony of the

15

fingerprint experts is indicative only of their confusion over the use of AFIS in the fingerprint identification process.[9]

We are also not persuaded that the jury's acquittal of Sanders on the other four robbery counts is indicative of a reasonable possibility it would have acquitted him of this robbery had he been allowed to question Kim about his Facebook post. Our review of the record shows that there was no fingerprint evidence linking Sanders to any of the other four robberies, and thus his identity as the robber was *entirely* dependent on the testimony of eyewitnesses[10] and perhaps surveillance video.

### B. *New trial motion*

Sanders next contends that the trial court erred in denying his motion for a new trial on the grounds of newly-discovered evidence. Essentially conceding, as he must, that counsel failed to exercise reasonable diligence in presenting the evidence to the court, he argues that the denial of the motion resulted in a miscarriage of justice.[11] As discussed below, we disagree.

---

[9] The jury's question was, as follows: "Please instruct if we are to consider the AFIS score in the defense evidence into account? One juror wants to infer meaning/process from these scores of each fingerprint. Is there clarity that can be provided to the meaning/validity of these scores and if we are to infer meaning. Specifically one juror wants to know why the index finger match did not have the top AFIS score." The parties agreed upon the following response: "There was testimony regarding the scores associated with the prints retrieved through AFIS; that testimony has been read back to you and the exhibits admitted show the scores. There was, however, no evidence (testimony or exhibits) regarding the meaning or significance of these scores. You may consider all the evidence that was presented during the trial and make reasonable inferences from that evidence, but you may not speculate as to evidence that was not presented."

[10] According to the victims' testimony, the perpetrator wore a mask during each of the other four robberies. Kim testified that Sanders was not wearing a mask when he robbed the Petco.

[11] Sanders also briefly contests the trial court's characterization of the evidence as cumulative, but the trial court expressly stated that its denial of the motion was "mainly" based on its determination that the evidence would not "render a different result probable on a retrial" and the lack of reasonable diligence.

### 1. *Applicable law and standard of review*

A new trial motion may be brought "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. 8.) " ' "To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." [Citation.] "[T]he trial court has broad discretion in ruling on a new trial motion . . . ," and its "ruling will be disturbed only for clear abuse of that discretion." ' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016 (*O'Malley*).) "We must review each case on its own factual background and will not disturb the trial court's ruling unless ' " 'a manifest and unmistakable abuse of discretion clearly appears.' " ' " (*People v. Soojian* (2010) 190 Cal.App.4th 491, 512 (*Soojian*).)

" 'In addition, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citation.]' [Citation.] [¶] ' "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " ' " (*O'Malley*, *supra*, 62 Cal.4th at pp. 1016-1017.) A new trial motion cannot succeed unless it establishes that it is reasonably probable that the newly discovered evidence would have produced a different outcome at trial. (*People v. Martinez* (1984) 36 Cal.3d 816, 822 (*Martinez*).)

### 2. *Additional background*

After trial, the defense took possession of the shirt Kim was wearing during the robbery in order to have it tested for DNA. Defense counsel explained to the court that, before trial, she made a strategic decision to focus on the existing evidence because

Sanders was facing multiple counts in this case plus there was evidence relating to uncharged acts. After the verdicts came in, counsel believed she had an "ethical duty to pursue any additional information that might come from this item of evidence."

Once the results of the DNA tests became available, defense counsel filed a supplemental motion for a new trial[12] on the grounds of newly discovered evidence, specifically the discovery of "a mixture of contact DNA on Mr. Kim's shirt around the area where Mr. Kim was grabbed by the robber[,] . . . [which] revealed very strong evidence that Mr. Sanders was not a contributor to the mixture." Counsel further described the test results as follows: "The mixture from the left shoulder is approximately 2,000,000,000 [times] more likely if the DNA originated from four unknown individuals than if the DNA originated from Ricky Sanders and three unknown individuals."

The trial court, after finding that the evidence was "newly discovered," denied the motion principally on the grounds that Sanders could not show that the evidence would "render a different result probable on a retrial" and because defense counsel could not show reasonable diligence in discovering and presenting the evidence at the initial trial. Regarding the likelihood of a different result, the court stated its belief that the evidence of Sanders's guilt on count 5 was "overwhelming," consisting of "multiple identifications; 1101(b) evidence; and a fingerprint match." The fact that Kim was the major contributor of DNA on the shirt and that there were "unknown potential minor contributors" would not change the result.

As to reasonable diligence, the court stated that the defense could easily have discovered the evidence and presented it at trial. The defense was "the party that called

---

[12] Defense counsel had already filed a motion for new trial, but that motion is not included in the record and we do not know the grounds on which that motion was made. Sanders does not raise any issues associated with that motion on appeal, so we make no further reference to it.

18

the DNA analyst from the Santa Clara County Crime Laboratory, specifically, for the purpose of highlighting to the jury the potential of receiving DNA contact samples from a[n] item such as the shirt." The trial court concluded that the reasonable diligence "rule is in place for exactly this type of case," where defense counsel makes a reasonable decision to " 'take tactical advantage of the lack of the [DNA] examination during the trial,' "[13] but then conducting DNA testing only after her client is convicted.

### 3. Analysis

As he did below, Sanders argues that denying a new trial based on the DNA evidence, even if trial counsel was not reasonably diligent in discovering that evidence, constitutes a miscarriage of justice, citing *Martinez*, *supra*, 36 Cal.3d 816 and *Soojian*, *supra*, 190 Cal.App.4th 491. *Martinez* and *Soojian* are readily distinguishable and we disagree that denying Sanders a new trial on the basis of this DNA evidence amounts to a miscarriage of justice.

In *Martinez*, *supra*, 36 Cal.3d 816, the defendant was convicted of burglary of various items of machinery from a tool company where he had previously worked. (*Id.* at p. 819.) One of the stolen items, a drill press, was found abandoned by a fence surrounding the business, and the defendant's palm print was lifted from that item. The defendant worked at a different business across the street at the time of the theft, but testified that he frequently visited the tool company as part of his current job and would visit with his friends while there, occasionally leaning on or touching various machines during those visits. He last visited the tool company the day before the burglary. A maintenance worker testified for the prosecution that he cleaned and painted the stolen drill press the day of the theft, which created a necessary inference that the defendant's

---

[13] During final argument, defense counsel raised the lack of DNA testing on Kim's shirt at least twice, calling the jury's attention to "the DNA test that was not performed on the shirt Daniel Kim was wearing" and pointing out that the "District Attorney's [o]ffice[] . . . literally ha[s] an in-house DNA lab that they're not sending this shirt to."

palm print was not from one of his previous visits but from when he committed the burglary. (*Id.* at pp. 819-820.)

In his motion for a new trial, the defendant submitted a declaration from another tool company employee who said the drill press had been cleaned and painted days before the burglary, not the same day. (*Martinez, supra*, 36 Cal.3d at pp. 820-821.) The Court of Appeal affirmed the trial court's order denying the motion on the grounds that trial counsel failed to exercise reasonable diligence in discovering the new evidence and the evidence itself would not render a different result probable at retrial. (*Id.* at pp. 822-823.)

The California Supreme Court reversed. It agreed that defense counsel failed to use reasonable diligence in discovering this evidence, but concluded this was not a sufficient basis for denying the motion. (*Martinez, supra*, 36 Cal.3d at pp. 824-825.) According to the court, this diligence requirement serves " 'a public policy which demands that a litigant exhaust every reasonable effort to produce at his trial all existing evidence in his own behalf, to the end that the litigation may be concluded.' " (*Id.* at p. 825.) However, it also serves a "more fundamental purpose—the determination of guilt and innocence." (*Ibid.*) The court noted that it is antithetical to our system of justice that newly-discovered evidence which would probably result in a defendant's acquittal cannot be used at a new trial simply because defense counsel "failed to use diligence to discover the evidence." (*Ibid.*) Because the newly-discovered evidence in *Martinez* cast serious doubt on the strongest evidence against the defendant, i.e., the window of time in which his palm print could have been deposited on the drill press, denying a new trial constituted a miscarriage of justice.

In *Soojian*, the jury convicted the defendant on charges of attempted murder and robbery and, during the trial, the defendant introduced evidence implicating his cousin as the actual perpetrator. (*Soojian, supra*, 190 Cal.App.4th at pp. 494-504.) Posttrial, the defendant discovered additional evidence showing that his cousin was the person who

committed the offenses. (*Id*. at pp. 504-505.) The trial court denied the defendant's motion for new trial concluding that the evidence could have been discovered and presented at the first trial and, even if a new trial including that evidence were held, "a different result was not probable." (*Id*. at p. 511.)

The Court of Appeal reversed, concluding that the exclusion of the new evidence due to trial counsel's lack of reasonable diligence would result in a miscarriage of justice. (*Soojian*, *supra*, 190 Cal.App.4th at pp. 512-518.) Like *Martinez*, the newly-discovered evidence "directly contradicted most of the People's evidence." (*Id*. at p. 522.) For example, blood-stained clothing found underneath the defendant's mobilehome appeared to be the wrong size. (*Ibid*.) There were also inconsistencies relating to the blood evidence. The nature of the victim's injuries would have resulted in significant bleeding and a blood-soaked work order found in the defendant's vehicle was consistent with such elevated bleeding. However, only a very small amount of the victim's blood was found in the defendant's vehicle—much less than what her injuries would have generated and much less than the blood on the work order indicated. (*Id*. at p. 523.)

Finally, although the victim identified the defendant as the perpetrator, she did not describe him as having a goatee and it was undisputed he had a goatee at the time of the offense. (*Soojian*, *supra*, 190 Cal.App.4th at p. 523.) Part of the new evidence offered by the defendant was an eyewitness identification expert who opined that an omission of this nature "raises serious doubts as to the identification." (*Ibid*.)

In this case, unlike *Martinez* and *Soojian*, the newly-discovered evidence does not directly call into question the strongest evidence demonstrating that Sanders committed the robbery. The surveillance video showed the robber touching a dog mat and Sanders's fingerprints were lifted from that item. While the DNA evidence showed that it was unlikely Sanders's DNA was present, it had already been explained that obtaining DNA of sufficient quality to build a profile was based on luck as much as science. The lack of Sanders's DNA on the shirt was not dispositive and denying a new trial does not amount

21

to a miscarriage of justice. As a result, we conclude that the trial court did not abuse its discretion in denying the motion for a new trial as it was not reasonably probable that the newly discovered evidence would have produced a different outcome at trial.

### C. Cumulative error

Sanders argues the cumulative prejudicial effect of the claimed errors deprived him of a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

In this case, we have rejected Sanders's argument that the trial court erred in denying his motion for a new trial. We agreed that there was error in not allowing defense counsel to introduce evidence of, and cross-examine on, a prior inconsistent statement by Kim, but found that error harmless. As there was no other error to cumulate with that error, we must reject Sanders's cumulative error argument.

### D. Ability to pay

Sanders's final argument is that there is insufficient evidence to support the trial court's finding that he has the ability to pay discretionary fines and fees, and the court should have first held an ability-to-pay hearing, as required by *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), before imposing them. We conclude that the record supports the trial court's ability-to-pay finding and further that Sanders failed to provide any evidence below supporting his inability to pay.

#### 1. Additional background

At sentencing, after the court stated the fines, fees, and assessments it was imposing, defense counsel objected and asked the court to "please consider Mr. Sanders' lack of ability to pay any discretionary fines or fees. I would ask the Court to consider that he has no ability to pay at this time and to strike anything discretionary."

22

The court denied the request, stating, "I do believe he does have the ability to pay and that he is a fit individual who may perform work at the California Department of Corrections and Rehabilitation. So I do—did take that in consideration in ordering the fines and fees."

### 2. *Applicable legal principles and standard of review*

Former section 1202.4, subdivision (d) provided in pertinent part: "[T]he court shall consider any relevant factors including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." The trial court has the discretion to determine the exact amount of restitution fine to impose and we review its decision for an abuse of discretion. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1321.)

In *Dueñas*, *supra*, 30 Cal.App.5th 1157, the Second Appellate District concluded that due process required the trial court to stay execution of any restitution fine unless and until it holds an ability-to-pay hearing and finds that the defendant has the ability to pay. (*Id.* at p. 1172.) Courts of Appeal, including panels of this court, have reached different conclusions as to whether *Dueñas* was correctly decided (*People v. Hicks* (2019) 40 Cal.App.5th 320, 325, review granted Nov. 26, 2019, S258946; *People v. Santos* (2019) 38 Cal.App.5th 923, 933-934 (*Santos*); *People v. Adams* (2020) 44 Cal.App.5th 828, 831-832; *People v. Petri* (2020) 45 Cal.App.5th 82, 92), and the issue is

23

presently pending before the California Supreme Court (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844).

Even if we assume *Dueñas* was correctly decided, "it is the defendant's burden to demonstrate an inability to pay, not the prosecution's burden to show the defendant *can* pay, as the *Dueñas* decision might be read to suggest." (*Santos*, *supra*, 38 Cal.App.5th at p. 934.)

On appeal, Sanders characterizes his argument as a claim that substantial evidence does not support the trial court's determination that he had the ability to pay the fines and fees imposed. Although an appellate court usually reviews for substantial evidence a trial court's resolution of disputed factual issues (*People v. Trinh* (2014) 59 Cal.4th 216, 236), "[w]hen the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279 (*Shaw*).) "This is because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case. [Citations.] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*)

Based on the record before us, we conclude that the evidence does not compel a finding, as a matter of law, that Sanders was unable to pay the fines imposed. Sanders failed to provide any evidence in support of his claim that he had an inability to pay, and

the trial court properly relied on the fact that Sanders could earn prison wages while incarcerated.

During the sentencing hearing, defense counsel briefly informed the court that Sanders "has no ability to pay at this time." Aside from this cursory argument, Sanders presented no evidence and did not request a further hearing on his ability to pay the fine. In response, the trial court expressed its belief that Sanders "does have the ability to pay and that he is a fit individual who may perform work at the California Department of Corrections and Rehabilitation. So I . . . did take that in consideration in ordering the fines and fees."

The trial court's comments reflect that it properly considered Sanders's ability to earn prison wages while incarcerated. " ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody.' " (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 (*Aviles*).)

In this case, Sanders was 42 years old when he was sentenced. "Wages in California prisons currently range from $12 to $56 a month. [Citations.] And half of any wages earned (along with half of any deposits made into [a defendant's] trust account) are deducted to pay any outstanding restitution fine." (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; see *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 ["defendant's ability to obtain prison wages" is properly considered when determining ability to pay]; *Santos*, *supra*, 38 Cal.App.5th at p. 934 [same].) Although there was evidence in the record that Sanders had some back issues, including a "herniated back" diagnosis in 2002 and surgery for a "narrowing of his spine" in 2007, Sanders had been

25

working part-time "as a welder and park attendant" from 2010 to the time of his arrest in San Mateo County.[14]

Assuming that Sanders earns $56 a month and half of his earnings are applied toward his fines, it will take him approximately 30 years to pay his restitution fine. Although this is a significant amount of time, it is approximately three-quarters of his sentence in this proceeding. Without offering more, the trial court could have reasonably concluded that he failed to carry his burden to "present evidence of his . . . inability to pay." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; *Aviles*, *supra*, 39 Cal.App.5th at p. 1062 [defendant sentenced to term of 82 years to life had ability to pay $10,600 in restitution fines, $160 in court operations assessments, and $120 in court facilities funding assessments].)

Sanders argues that his ability to work in prison will depend on the availability of prison jobs, and there is no guarantee that he will be able to secure a paying position. On appeal, Sanders cites to a report by the Legislative Analyst regarding the Governor's criminal justice proposals as set forth in the 2018-2019 budget[15] for the proposition that "employment opportunities for inmates . . . are virtually non-existent." This report, however, was not presented to the trial court and we may not consider it on appeal in the first instance. (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1249 ["we cannot consider on appeal evidence that is not in the record"].) Likewise, Sanders also presented no evidence of his inability to obtain a paid position.

Here, Sanders bore the burden to present evidence of his inability to pay, which he failed to do. Accordingly, based on the record before us, we cannot say that there is uncontradicted and unimpeached evidence that compels a finding that Sanders is unable

---

[14] We were unable to locate an arrest date in San Mateo County in the record, but the probation report notes that Sanders was sentenced in August 2014 to 834 years to life in that jurisdiction.

[15] See https://perma.cc/TJQ3-HXFH pages 13-16 (as of July 26, 2022).

26

to pay the challenged fines through prison wages or other sources of income, such as gifts from family members.  (See *Shaw*, *supra*, 170 Cal.App.4th at p. 279; *People v. Romero* (1996) 43 Cal.App.4th 440, 449 [trial court should presume ability to pay a restitution fine when defendant adduces no evidence of inability to pay].)

### E. Criminal justice administration fee

The parties agree that, during the pendency of this appeal, there has been a change in the law relating to the criminal justice administration fee of $259.50 imposed pursuant to former Government Code sections 29550, 29550.1, and 29550.2.  Those statutes have been repealed.  Effective July 1, 2021, Assembly Bill No. 1869 revised Government Code section 6111, which now provides, "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . [Government Code] [s]ection 29550, and [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)  Pursuant to the plain language of Government Code section 6111, the unpaid balance of the criminal justice administration fee is unenforceable and uncollectible, and the portion of the judgment imposing that fee must be vacated. (*People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)  Accordingly, we will direct the trial court to modify the judgment as mandated by the new law.

### III.    DISPOSITION

The judgment is modified to vacate any portion of the $259.50 criminal justice administration fee that remained unpaid as of July 1, 2021.  As so modified, the judgment is affirmed.

27

_____
                                      Wilson, J.

WE CONCUR:

_____
            Bamattre-Manoukian, Acting P.J.

_____
                Danner, J.

People v. Sanders
H047615